IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

VOLKMANN V. BARATTA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JACOB A. VOLKMANN, APPELLEE,

V.

JAIMEE K. BARATTA, APPELLANT.

Filed March 7, 2023.    No. A-22-438.

Appeal from the District Court for Douglas County: DUANE C. DOUGHERTY, Judge. Affirmed.

Donald A. Roberts, of Roberts Law, L.L.C., for appellant.

Krisanne C. Weimer, of Weimer Law, P.C., for appellee.

MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Jaimee K. Baratta and Jacob A. Volkmann (Jacob) had a son, Jacob Allen Volkmann, Jr. (Jacob Jr.), while residing together in Colorado; they were not married. Not long after the child's birth, the parties had an altercation and Jaimee moved to Nebraska with the child. Immediately thereafter, Jacob filed the present action in the Douglas County District Court, seeking to establish paternity and custody of the parties' son. At trial, although not previously pled, Jaimee requested that the court change Jacob Jr.'s surname from "Volkmann" to "Volkmann-Baratta." The court entered a paternity decree establishing Jacob's paternity and adopting the parties' parenting plan which provided for joint legal custody with primary physical custody granted to Jaimee. The order also required that Jacob pay child support to Jaimee and equally allocated childcare costs and noncovered healthcare expenses exceeding $250 per year. The court declined to change the minor

child's surname. Jaimee appeals the court's determinations regarding the child's surname, child support, and the allocation of expenses. We affirm.

## II. BACKGROUND

### 1. PLEADINGS AND TEMPORARY ORDER

On February 15, 2021, Jacob filed a "Complaint for Paternity," requesting that the district court enter an order establishing Jacob's paternity of Jacob Jr., granting Jacob parenting time, and awarding joint legal and physical custody of Jacob Jr. to the parties. On March 23, Jaimee filed an "Answer and Cross-Complaint," wherein she admitted that Jacob is the biological father of Jacob Jr. She also requested that the court enter an order awarding temporary and permanent sole legal and physical custody of their son to Jaimee, subject to Jacob's supervised parenting time; requiring Jacob to pay temporary and permanent child support to Jaimee; and requiring Jacob to pay for their son's medical insurance, "an appropriate amount of unreimbursed medical expenses," "an appropriate amount of child care expenses," and attorney fees.

On April 2, 2021, the district court entered a "Temporary Custody Order," awarding Jaimee temporary sole legal and physical custody of Jacob Jr., subject to Jacob's supervised parenting time, ordering that Jacob pay $290 per month in child support to Jaimee, and allocating "uncovered medical expenses" equally between the parties. It further required that there "be no dogs present during" Jacob's parenting time.

### 2. TRIAL

Trial took place on March 28, 2022. Only Jaimee and Jacob, both 31 years old, testified, and numerous exhibits were received into evidence. We now set forth the evidence relevant to the issues on appeal.

### (a) History of Parties' Relationship

Jacob testified that he and Jaimee dated in Nebraska for "a couple of weeks, maybe a month" before they moved to Colorado together where they cohabitated for 1½ to 2 years. During that time, Jaimee became pregnant with their child. Jacob described their relationship as "going okay" in the time leading up to the birth of the child. According to Jacob, Jaimee agreed he would name the child if it was a boy and Jaimee would name the child if it was a girl. When their son was born in December 2020, Jacob named him Jacob Allen Volkmann, Jr. Jacob testified that Jaimee did not object to the name. At the time of Jacob Jr.'s birth, the parties completed a "Voluntary Acknowledgement of Parentage," wherein the minor child's name is listed as Jacob Allen Volkmann, Jr. The district court received the document into evidence. On cross-examination, Jaimee acknowledged that she had signed the document.

While Jaimee and Jacob were living in Colorado, Jacob had 4 pit bull dogs. The parties described an incident that took place on January 26, 2021, involving one of the pit bulls. Jacob stated that he and Jaime "got into an altercation" and Jaimee "jumped on [his] back and was hitting [him]." One of Jacob's dogs "broke through the baby gate[,] . . . grabbed onto the back of [Jaimee's] calf[,]" and dragged her off of Jacob. Jacob testified that the dogs had not previously caused any problems until this incident. According to Jaimee, Jacob "attacked [her] for [her] phone after he was threatening to hit [her]" and then from behind her, Jacob took her phone and picked

her up off her feet to "wrestle" her to the ground. "And that was when his dog jumped through the baby gate and grabbed ahold of [her] leg." Jaimee acknowledged that the dogs had previously been "fine" to her and that she did not "have any sense of them being vicious." A picture received into evidence showed four dogs cuddled around Jaimee on a bed and another picture showed two dogs near her, with one resting its head on hers.

Jacob testified that after the incident, he immediately took Jaimee to the hospital. However, Jaimee testified that Jacob would not allow her to request emergency assistance because he worried that his dog would be taken from him. Jaimee stated that she was eventually able to call 911. Law enforcement arrived but no charges were filed against Jacob at the time.

Jaimee testified that following the incident, Jacob "kicked [her and Jacob Jr.] out" because he "love[d] [his] dog too much" to "get rid of him." On January 30, 2021, Jaimee moved back to Nebraska with Jacob Jr. According to Jacob, he did not "hear a word from [Jaimee] for a few days." Law enforcement arrived at his residence to arrest him about 1 week after the dog bite. Jacob eventually pled guilty to "obstruction of a telephone" and was ordered to serve 18 months of probation. He stated that there were originally other charges filed against him, including "harboring a dangerous animal," but those charges were dropped.

While Jacob was in jail, Jaimee returned to Colorado to retrieve certain belongings. Jacob testified that when he returned home, "everything was pretty much gone." Jaimee stated that she only took Jacob Jr.'s belongings, a bassinet, a rocking chair, and a dresser that her mother had purchased for them.

Jacob testified that in April 2021, he moved back to Nebraska to be near his son. Although Jacob brought two of his dogs with him to Nebraska, he gave them both away after the district court entered a temporary custody order requiring that there be no dogs present during Jacob's parenting time with his son. Jacob's lease agreement for his residence at the time of trial included a "pet agreement," indicating that he had two dogs. Jacob stated that he signed the lease agreement prior to the temporary hearing so he had his landlord include the "pet agreement" in case the court allowed him to keep the dogs. Jacob testified that, following the temporary hearing, he did not allow the dogs to be in the presence of Jacob Jr.

(b) Jacob's Education and Employment

Jacob stated that he had graduated from high school in 2008 and completed some college education but never graduated. He stated that he "proceeded to work little dead-end jobs here and there" until he moved to Colorado in 2018. There, he worked for "medical marijuana dispensaries" and eventually obtained a "medical marijuana license" and opened his own business selling marijuana. He stated that he also worked for Amazon, earning $15 per hour, and completed various "side jobs" to earn a living while in Colorado. In April 2021, he moved back to Nebraska and began working as a "heavy equipment operator," earning $18 per hour. He had this job until August 2021, when he was laid off because his services were no longer needed for his employer's project. He was unemployed for a period of 7 months. During 2 of those months, he attended classes at the "Merrell School of Real Estate." At the time of trial, he was preparing to complete certain licensing requirements so he could sell real estate. There was no testimony regarding his earning potential in real estate sales.

Jacob testified that, at the time of trial, he was employed by the "Woodhouse Family," working 32 hours per week at $14.25 per hour. He further stated that he had applied for numerous jobs but was "denied at all of them due to [his] probation." When asked on cross-examination whether he "had the ability" to earn $17, $18, $20, or $25 per hour, he responded affirmatively. When asked why he does not "have a job at any of those rates," he stated that he "didn't get accepted at any of those rates."

### (c) Conflict Regarding Jacob Jr.'s Name

Jaimee testified that as soon as she returned to Nebraska, she began calling Jacob Jr. by the name Lucas. Jacob testified that Jaimee was attempting to change Jacob Jr.'s name to Lucas Alexander Baratta. Jacob stated that he first realized this when he was picking up Jacob Jr. from daycare and noticed that his "cubby" was labeled "Lucas." When Jacob confronted Jaimee by text, she stated that while their son's name is legally "Jacob Allen Volkmann, Jr.," she does "not call him Jacob. He does not go by Jacob in [her] household, and he never will. To avoid major confusion, he goes by Lucas and answers to Lucas." On at least two occasions, Jacob confronted the daycare staff about their use of the name "Lucas" when referring to Jacob Jr. After the second confrontation, Jaimee sent Jacob a text message stating "[t]his is the second episode you've been yelling at daycare staff. I will never call our son Jacob for the rest of my life while I have him or my family members or friends have him. He is Lucas." The district court received the text messages into evidence.

Although not pled in her "Cross-Complaint," Jaimee requested that the district court change Jacob Jr.'s surname from Volkmann to "Volkmann-Baratta," stating "my son is half of me, and I'm his mother. . . . And because of the fact that . . . [Jacob] kicked us out of our home with nowhere to live." Jacob stated that he opposed hyphenating the surname because he wanted his "name to be passed down" and hyphenating Jacob Jr.'s name would not make sense because "he's a junior." Jacob further stated that they had consistently referred to Jacob Jr. as Jacob or Junior since his birth. Jacob asked that the court enter an order requiring Jaimee to refer to and call Jacob Jr. by his legal name.

### (d) Childcare and Medical Expenses

Jaimee testified that, at the time of trial, she was working as a bartender and server on Tuesdays and Thursdays from 1:30 p.m. to 8 p.m. She also stated that she recently started working "Wednesday evenings and every other Saturday day." During the day, Jacob Jr. attends daycare at a facility that is open until 5 p.m. Jaimee's Title XX benefits cover the cost of the daycare, but she pays out of pocket for a friend to watch Jacob Jr. when she works in the evening.

Jaimee also stated that, beginning in May 2022, she would be attending classes "Monday through Friday" from "8:30 to 4:30" to become a licensed esthetician in Nebraska. She stated that she would also continue to work evenings on Wednesdays. Her Title XX benefits would continue to cover the costs of daycare.

Jacob testified that he offered to care for Jacob Jr. during Jaimee's evening shifts but that she "declined and said there's no way [he]'ll get an extra hour with [Jacob Jr.]." Jaimee testified that Jacob requested that she allow his mother to care for Jacob Jr. during her evening shifts, but that she had refused because in the past, when their son was in Jacob's mother's care, she failed to

adequately communicate with Jaimee. At trial, Jacob requested that he be granted a "right of first refusal so that [he] can provide care for [his] son" when Jaimee needs childcare. Jacob also requested that the court order that the parties "share" childcare expenses.

Jaimee stated that Jacob Jr. has various medical conditions which require frequent visits to the doctor. Although most of his medical expenses are covered by Medicaid, Jaimee pays out of pocket for certain medications. Jacob requested that the district court order that the parties be equally responsible for out-of-pocket medical expenses.

### 3. DISTRICT COURT'S ORDER

On April 20, 2022, the district court entered a "Decree of Paternity," finding that Jacob is the biological father and Jaimee the biological mother of Jacob Jr. The court adopted the "Parenting Plan" prepared by the parties during earlier mediation. Jacob was ordered to pay $368 per month in child support. Neither party was ordered to provide Jacob Jr. with health insurance because he was already enrolled in Medicaid. Jaimee was directed to pay the first $250 per calendar year of "uninsured medical, dental, orthodonti[c], optical . . . , psychological, and psychiatric expenses." Once that threshold was reached, the parties were each responsible for 50 percent of such expenses. The court declined to award Jacob the "right of first refusal" and ordered that the parties each pay 50 percent of childcare expenses not covered by Title XX and which are incurred by the parties "to maintain gainful employment or to obtain education to enhance their earning potential."

The district court found that "Jacob Allen Volkmann, Jr." was Jacob Jr.'s legal name and it ordered that neither party take any steps to change his legal name. It further ordered that Jaimee "take all necessary steps to change [Jacob Jr.'s] legal name at any daycare, school, or medical providers, etc. so as to reflect" his true legal name. It prohibited Jaimee from using "any other legal name for [Jacob Jr.] on any document that may be required with various entities as Jacob Jr.'s life goes forward." The court did not further discuss the issue of hyphenating Jacob Jr.'s surname.

### 4. MOTION FOR NEW TRIAL

On April 26, 2022, Jaimee filed a "Motion for New Trial or to Alter or Amend." She claimed the district court erred in calculating child support, allocating medical and childcare expenses, failing to require Jacob to be current on child support, childcare expenses, and nonreimbursed medical expenses in order to claim Jacob Jr. as a dependent, failing to change Jacob Jr.'s surname, and failing to award Jaimee attorney fees.

On June 13, 2022, the district court entered an "Amendment to Decree of Paternity." Although that order refers to a hearing on Jaimee's motion taking place on May 11, Jaimee did not request the inclusion of that hearing in her "Praecipe for Bill of Exceptions," and therefore it is not contained in our record. The court amended the paternity decree to include a provision requiring that Jacob be current on his "child support, daycare expenses, and uninsured medical expenses" at the end of odd-numbered calendar years in order "to claim his dependency exemption/tax credit" for Jacob Jr. The court denied all other relief requested by Jaimee.

Jaimee appeals.

## III. ASSIGNMENTS OF ERROR

Jaimee assigns that the district court erred in (1) failing to change Jacob Jr.'s surname "to be hyphenated to include Jaimee's surname," (2) failing "to impute higher income to Jacob" for purposes of calculating his child support obligation, and (3) determining that "each party pay 50% of all day care and uninsured medical expenses" for Jacob Jr.

## IV. STANDARD OF REVIEW

An appellate court reviews a trial court's decision concerning a requested change in the surname of a minor de novo on the record and reaches a conclusion independent of the findings of the trial court. Provided, however, that where credible evidence is in conflict on a material issue of fact, the appellate court considers and gives weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *In re Change of Name of Slingsby*, 276 Neb. 114, 752 N.W.2d 564 (2008).

While a paternity action is one at law, the award of child support in such an action is equitable in nature. *State on behalf of Kayla T. v. Risinger*, 273 Neb. 694, 731 N.W.2d 892 (2007). A trial court's award of child support in a paternity case will not be disturbed on appeal in the absence of an abuse of discretion. *Id*.

## V. ANALYSIS

### 1. REQUESTED SURNAME CHANGE

Jaimee contends the district court erred in failing to grant her request to change Jacob Jr.'s surname from "Volkmann" to "Volkmann-Baratta." She argues that "[n]ot once during direct examination with his attorney, did Jacob set forth any specific reason why he wanted to keep their son's last name as it was and not hyphenate that name now that Jacob and Jaimee were no longer together." Brief for appellant at 12. She goes on to assert, "It was not until cross examination that Jacob adamantly refused to have Jaimee's name be a part of their son's name and set forth his reasoning." *Id*. In response, Jacob correctly points out that Jaimee failed to provide any notice by her "operative pleadings" that the name of the minor child was at issue. Brief for appellee at 8. He states, "To then be critical that [Jacob's] case in chief did not include evidence or testimony on that issue is disingenuous at best." *Id*. Jacob points out that "the lack of evidence or testimony in [his] case in chief on this issue is a reflection of why the operative pleadings are to identify all contested issues to be addressed by the Court." *Id*.

It is true that Jaimee did not plead a request to change Jacob Jr.'s surname. However, no objection was made when questions were asked about this issue during trial. Neb. Ct. R. Pldg. § 6-1115(b) provides that when issues not raised by the pleadings have been tried by the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. *Schmid v. Simmons*, 311 Neb. 48, 970 N.W.2d 735 (2022). Consent may be implied if during the trial the party acquiesces or fails to object to the introduction of evidence that relates only to that issue. *Id*. Since there was no objection at trial, we will address Jaimee's alleged error.

The question of whether the name of a minor child should be changed is determined by what is in the best interests of the child. *Minnig v. Nelson*, 9 Neb. App. 427, 613 N.W.2d 24 (2000). The proponent of the change in surname has the burden to prove that the change in surname is in

the child's best interests. *Id*. Cases considering this question have granted a change of name only when the substantial welfare of the child requires the name to be changed. See *Spatz v. Spatz*, 199 Neb. 332, 258 N.W.2d 814 (1977).

The Nebraska Supreme Court has set forth a non-exhaustive list of factors to be considered when determining whether a name change is in the best interests of a child. These factors are (1) misconduct by one of the child's parents; (2) a parent's failure to support the child; (3) parental failure to maintain contact with the child; (4) the length of time that a surname has been used for or by the child; (5) whether the child's surname is different from the surname of the child's custodial parent; (6) a child's reasonable preference for one of the surnames; (7) the effect of the change of the child's surname on the preservation and development of the child's relationship with each parent; (8) the degree of community respect associated with the child's present surname and the proposed surname; (9) the difficulties, harassment, or embarrassment that the child may experience from bearing the present or proposed surname; and (10) the identification of the child as a part of a family unit. *In re Change of Name of Slingsby, supra*. Other important factors include the motivation of the parties, the effect a failure to change the name will have on furthering the estrangement of the child from a parent exhibiting a desire to preserve a parental relationship, the possibility that a different surname may cause insecurity or a lack of identity, and the use of a particular surname for a substantial length of time without objection. *Minnig v. Nelson, supra*.

When asked why she wanted Jacob Jr.'s name to be hyphenated, the following was the full extent of Jaimee's testimony:

> Because my son is half of me, and I'm his mother. And I feel like it shouldn't just be one sided. I should be a part of his name because of the fact that we were not ever married, and we didn't stay together for very long. And because of the fact that, you know, that's the man that kicked us out of our home with nowhere to live.

Considering the foregoing factors and the minimal evidence produced in support of changing Jacob Jr.'s surname, we conclude that Jaimee failed to meet her burden of proof. At the time of the hearing, Jacob Jr. was 15 months old and was therefore unable to express a reasonable preference. In her brief on appeal, Jaimee points to expert testimony from a different case to argue that Jacob Jr. was not old enough to identify with his last name. However, there was no evidence adduced at her own trial to show this--not even her own testimony. There was also no evidence presented to suggest that Jacob had failed to support or maintain contact with Jacob Jr. In fact, Jacob testified that he moved back to Nebraska so he could be near Jacob Jr. and consistently paid child support to Jaimee throughout the course of the litigation. There was no evidence suggesting that leaving Jacob Jr.'s surname as Volkmann or changing it to Volkmann-Baratta would have any impact on the preservation and development of Jacob Jr.'s relationship with each parent; impose any difficulties, harassment, or embarrassment for him; or impact his identification as part of a family unit. There was no evidence concerning community respect associated with Jacob Jr.'s present or proposed surname.

Jaimee argues on appeal that Jacob committed misconduct when he "did not want Jaimee to turn him in, since he could lose one of his dogs" and he subsequently "kicked Jaimee and their son out of his residence." However, Jacob followed Jaimee and Jacob Jr. to Nebraska not long

after they left Colorado. Jacob also testified that he gave his dogs away after moving to Nebraska and did not expose Jacob Jr. to any of the dogs after the incident involving Jaimee.

Finally, it appears that Jaimee's motivation regarding changing Jacob Jr.'s name may in part be to punish Jacob. She stated that she began calling Jacob Jr. by the name "Lucas" as soon as she returned to Nebraska, and she expressed her intention to never call her son Jacob. As pointed out by Jacob, while seeking to add her name to Jacob Jr.'s surname, Jaimee "sees no problem in erasing [Jacob] from the name . . . by referring to her son as 'Lucas.'" Brief for appellee at 9. Jacob argues that Jaimee's refusal to call their son by his legal name "reflects that the change is not about what is in her son's best interest, but rather her efforts to erase [Jacob] from a meaningful connection with his son." *Id*. at 10. It is difficult to credit Jaimee with any good intentions here when she apparently sees no harm in the confusion she may be creating for her son by calling him Lucas and encouraging others to do the same, while at the same time all those in his father's sphere will be calling him Jacob, his actual legal name. Hopefully, both these parents love their son enough to set aside their past differences to allow them to chart a more harmonious course with a focus on Jacob Jr.'s best interests and not their own.

Upon our de novo review of the record, we conclude that the district court did not err in declining to change Jacob Jr.'s surname.

## 2. CHILD SUPPORT CALCULATION

Jaimee claims the district court erred when it calculated Jacob's child support obligation based on his actual income instead of his earning capacity.

In general, child support payments should be set according to the Nebraska Child Support Guidelines. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). Pursuant to Neb. Ct. R. § 4-204 (rev. 2020) of the guidelines, a court is to consider the total monthly income of both parties, which is defined as "income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages." The guidelines also provide that, if applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. *Armknecht v. Armknecht*, 300 Neb. 870, 916 N.W.2d 581 (2018). Use of earning capacity to calculate child support is useful when it appears that the parent is capable of earning more income than is presently being earned. *Id.*

Jacob testified that at the time of trial, he was employed with the "Woodhouse Family," working 32 hours per week at $14.25 per hour. The district court calculated Jacob's child support obligation based on this income. Jaimee argues that Jacob earned higher wages during his previous employment and suggests that Jacob intentionally obtained new employment earning a lower wage so his child support obligation would be reduced. However, the record shows that Jacob's changes in employment were either involuntary or made in good faith. Jacob testified that he left his job in Colorado, where he was earning $15 per hour, to be near Jacob Jr. in Nebraska. When he moved to Nebraska, Jacob began working as a heavy equipment operator, earning $18 per hour, but was laid off when he was no longer needed on the construction crew. He then did not work for period of 7 months. During 2 of those months, he took real estate sales classes. Although he stated that he intended to eventually sell real estate, he had not yet obtained a real estate license at the time of

trial. Additionally, no evidence was adduced regarding his earning potential as a real estate salesperson.

Jaimee suggests that Jacob's testimony that he could make $25 per hour demonstrates that Jacob is capable of earning more income than he was earning at the time of trial. However, Jacob also testified that he had applied to numerous higher-paying positions, but his applications were rejected due to his probation status. As such, the record does not show that Jacob was capable of earning more than his actual, present income at the time of trial.

We therefore find that the district court did not abuse its discretion when it calculated Jacob's income based on his actual, present income.

### 3. OUT OF POCKET MEDICAL AND DAYCARE EXPENSES

Jaimee contends that the district court "erred in requiring the parties to pay an equal percentage of uninsured medical expenses and daycare expenses." Brief for appellant at 18. Jaimee argues that the court should have assigned responsibility for such expenses to the parties in proportion to their income. However, the Nebraska Child Support Guidelines do not set forth such a requirement. Rather, the guidelines provide that childcare expenses and nonreimbursed reasonable and necessary children's health care costs in excess of $250 per child per year "shall be allocated to the obligor parent as determined by the court, but shall not exceed the proportion of the obligor's parental contribution" of the parties' combined monthly net income. §§ 4-214 and 4-215(B) (rev. 2020).

Here, the child support calculation used by the district court showed Jacob's parental contribution of the parties' combined monthly net income was 68.78 percent. Jaimee contends the court should have required Jacob to pay 69 percent rather than equal amounts of uninsured medical and daycare expenses. While the court had discretion to allocate to Jacob, the obligor parent, up to 68.78 percent of noncovered healthcare expenses in excess of $250, as well as up to 68.78 percent of childcare costs, it was not required to do so. Most of Jacob Jr.'s medical expenses were covered by Medicaid and his daytime childcare costs were covered under Title XX. Notably, Jacob was willing to provide care for Jacob Jr. in the evenings when Jaimee had to work which would have eliminated some childcare costs, however, Jaimee rejected that option. Based on this record, we cannot say it was an abuse of discretion for the court to allocate any childcare or noncovered healthcare expenses equally.

### VI. CONCLUSION

For the reasons set forth above, we affirm the district court's April 20, 2022, paternity decree, as amended on June 13.

AFFIRMED.